er giving to it all the weight to which it is entitled, it has failed to convince my mind that the management of the schooner was faulty in not beating out her tack. With regard to this fault also, I notice that the original answer filed in the cause made no mention of it, and did not deny the averment of the libellants that the tack was properly beat out; and although when the cause was called on for hearing, upon the application of the respondent, the answer was permitted to be amended by inserting a denial of this averment, so that issue is now properly taken upon this question of fact, yet in determining it, the circumstance that while it is now made the principal issue, no such fault was charged by the owners of the steamer when they swore to and filed their answer, is entitled to be considered. If the omission to beat out the tack was then deemed the great fault on the part of the schooner, it is difficult to account for its omission in the original answer, when the facts attending the collision were fresh in the recollections of all.

Looking at the whole case, my conclusion is that the collision in question was not caused by any fault of the schooner, but by the fault of the steamboat in not stopping in time to allow the schooner to beat out the tack and pass the steamer's bows in safety. The testimony of the pilot of the steamer shows this. He states that when he saw the schooner, he determined to pass to the northward of her, and expected her to tack to the southward of him as he was passing, and come out under his stern. The steamboat was accordingly sheered, but not stopped, below Hallett's Point, and when she struck the tide, in passing the Point, was allowed to take it more broadly upon her side than usual, which would have the effect to carry her further to the northward. The effort to time the speed of the steamer, so as to bring her opposite her position at the time of the tack, failed. The schooner, under the full strength of a powerful tide and full breeze, and being, as appears in evidence, an uncommonly quick worker, reached her place for tacking sooner than was anticipated, and when it was impossible for the steamer to pass her bows to the northward as had been intended. The engine was at once stopped and reversed, and with the helm hard-a-port, an effort was made to pass to the southward; but owing to the position which the steamer had assumed in the tide, she could not sheer rapidly to starboard, and before she had time to change her direction materially, the schooner was under her bows. Had the steamer taken up the tide in the ordinary manner, intending to pass to the southward of the schooner, it is quite possible, as the event showed, that she might have passed in safety, for a small sheer would have swung the steamboat sufficiently to have cleared the schooner. But however this may be, had the steamer stopped her engine before she began to pass the point, all possible danger of collision would have been avoided. It cannot be claimed that there was any difficulty in

her stopping below the point; and if, as proved by some of the witnesses, and as conceded by the counsel of the respondent, the tack was made when the steamer was abreast of Flood Rock, it was clearly the duty of the steamer to wait a moment before attempting to pass the point. Having selected the most hazardous course, and having failed of success in it, she must be held responsible for the damages which ensued. In arriving at this conclusion, I have attached little or no importance to the great mass of testimony introduced in the case, relating to conversation had with the crew of the schooner after the accident. This description of testimony, although often proved in actions for collisions, has, in most cases, been held by the court to be entitled to little weight, in determining disputed questions of facts appertaining to the navigation of the respective vessels; and where statements are denied by the witnesses upon the stand, and seem inconsistent with the cotemporary act of demanding payment for their vessel, I dismiss the evidence as of too uncertain a character to be relied on. The decree must be in favor of the libellants, with an order of reference to ascertain the amount of their damages.

[For a hearing on exception to the commissioner's report, see Case No. 4,473.]

## Case No. 17,587.
### WHITNEY v. FORT.

[Cited in Motte v. Bennett, Case No. 9,-884. Nowhere reported; opinion not now accessible.]

## Case No. 17,588.
### WHITNEY v. FORT.

[Cited in Phil. Pat. 416; Wilton v. The Railroads, Case No. 17,857; Motte v. Bennett, Id. 9,884. See Whitney v. Carter, Id. 17,583, where an extended quotation from the opinion is given. Nowhere more fully reported; opinion not now accessible.]

WHITNEY (HARDING v.). See Case No. 6,-052.

## Case No. 17,589.
### WHITNEY v. HUNTT.
[5 Cranch, C. C. 120.] [1]

Circuit Court, District of Columbia. March Term, 1837.

AUTHENTICATION OF DEPOSITIONS — NEGOTIABLE INSTRUMENTS—DEMAND OF PAYMENT—ADMISSIBILITY OF DECEASED NOTARY'S BOOKS—PROVINCE OF JURY.

1. A deposition taken in Louisiana before a person who calls himself "a commissioner duly appointed by the district court of the United States for the Eastern district of Louisiana, under and by virtue of the act of congress [2 Stat. 679] entitled 'An act for the more con-

[1] [Reported by Hon. William Cranch, Chief Judge.]